IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ROSALINDA LARKIN AS GUARDIAN/GUARDIAN AD LITEM OF CHARLES EDWARD LARKIN, JR., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DEREK KENISON, JR., et al.,<br><br>Defendants. | CIVIL NO. 18-00360-JAO-KJM<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Rosalinda Larkin ("Rosalinda"), as guardian/guardian ad litem of Charles Edward Larkin, Jr. ("Charles"), and on her own behalf, bring claims under federal and state law against Defendants Derek Kenison, Jr., Paul K. Ferreira, and the County of Hawai'i related to the seizure and arrest of Rosalinda's son, Charles, under a Hawai'i law permitting the detention of an individual who is imminently dangerous to himself or others. Presently before the Court are Defendants' motions for partial summary judgment. For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Defendants' motions.

# I.    BACKGROUND

## A.    Facts[1]

On March 8, 2018, Rosalinda called 911 asking for help transporting her son, Charles, to the emergency room ("ER").  *See* ECF No. 210 (Defs.' CSF) ¶ 17. Charles had not been sleeping and Rosalinda was concerned about Charles' paranoia, so had already taken him to the doctor on March 6.  *See id.* ¶¶ 1, 4–5.  On March 7, Rosalinda called Care Hawai'i Crisis Hotline for help with bringing Charles to Hilo Medical Center's ER.  *See id.* ¶ 7.  He was prescribed medication, but not able to sleep properly.  *See id.* ¶ 8.  On March 8, Rosalinda and Charles' caregivers, Tristan Inocencio ("Tristan") and Maoputasi Tai'i were together at Rosalinda's home and believed Charles needed to return to the ER.  *See id.* ¶¶ 9– 10.  Charles, however, did not want to go to the ER and left Rosalinda's home on foot and headed down Alaloa Road.  *See id.* ¶¶ 10–11.  When Rosalinda called 911, she gave Dispatch Charles' physical description and reported that her 25-year-old autistic son was running away (including through private residential properties).  *See id.* ¶¶ 18–19.  She explained that he currently suffered from anxiety and paranoia, had not slept for two weeks, and she wanted him to return to the ER, and so requested police and an ambulance.  *See id*.  Dispatch assigned

---

[1]  Unless otherwise indicated, the following facts are undisputed.

Rosalinda's call to Defendant Kenison ("Officer Kenison"), and relayed Charles' approximate location and that it was a behavioral disorder call involving a 25-year-old African-American autistic male running away from his residence and through a neighbor's property, who had an anxiety attack and had not slept for two weeks. *See* ECF No. 210 ¶¶ 20–21; ECF No. 210-16 (Tr. of Radio Transmissions) at 1. Officer Kenison located Charles at the corner of Hoʻokano and Koʻele Streets. *See* ECF No. 210 ¶¶ 24, 28.[2] Tristan and Rosalinda had followed Charles—at times on foot and at times in a vehicle—and were also near that intersection. *See* ECF No. 227-4 (Inocencio Decl.) ¶¶ 4–5; ECF No. 227-3 (Larkin Decl.) ¶¶ 4, 7.

What happened when Officer Kenison arrived on the scene is largely disputed, and is discussed in further detail below as relevant to Plaintiffs' specific claims. In short, Officer Kenison contends he repeatedly tried to communicate with Charles to no avail and Charles similarly did not listen to Rosalinda. *See, e.g.*, ECF No. 210 ¶¶ 24–34. Instead, Charles crossed one street and attempted to cross another, thereby endangering himself and others, which justified Officer Kenison's seizure of Charles and use of an arm-bar takedown to detain and handcuff Charles when he struggled and resisted. *See id.* Plaintiffs dispute what Officer Kenison said to Charles, claim that Rosalinda never spoke to Charles in

---

[2] The parties agree that Defendants' "Exhibit N" accurately reflects the path Charles took on March 8, 2018. *See* ECF No. 210-18.

Officer Kenison's presence, attest that Charles safely crossed one street that had no traffic, and that, although Charles ran, Officer Kenison quickly caught up to him. *See* ECF No. 227 (Pls.' Opp. Defs.' CSF) ¶¶ 24–34; *see also* ECF No. 227-4 ¶ 5; ECF No. 227-3 ¶ 7.  Officer Kenison then placed Charles in a bear hug, at which time Charles was under Officer Kenison's control, but Officer Kenison nonetheless immediately executed a leg sweep causing Charles to hit the concrete ground head first.  *See* ECF No. 227 ¶¶ 24–34; *see also* ECF No. 227-4 ¶ 5; ECF No. 227-3 ¶ 7.

Officer Kenison handcuffed Charles and, according to Rosalinda, did so while placing a knee on Charles' back.  *See* ECF No. 227-3 ¶ 6'b.[3]  An ambulance took Charles to the ER.  *See* ECF No. 210 ¶ 38.  Defendants contend Charles was combative on the way to the ER, requiring restraints, *see id.* ¶ 39, but Plaintiffs claim Charles was having seizures and kicking, *see* ECF No. 227 ¶ 39.  Charles required further restraint in the ER.  *See* ECF No. 210 ¶ 40.  Officer Kenison submitted to hospital personnel an application for emergency treatment for Charles.  *See id.* ¶ 41.

The Hawaiʻi County Police Department ("HCPD") has policies or procedures regarding the use of force, making arrests, how to handle critical incidents (meaning one that results in death or serious bodily injury) and how to

---

[3] Rosalinda's declaration contains two separate paragraphs both labeled paragraph 6 (at pages 3 and 12); thus, paragraph 6' refers to the second paragraph 6, beginning at page 12, in her declaration.  *See* ECF No. 227-3.

interact with persons suspected of suffering from a mental illness.  *See* ECF Nos. 227-19, 227-20, 227-21, 227-22.  The HCPD procedure for interacting with those believed to suffer from a mental illness provides that "[i]n addition to entry level mental illness training, all personnel shall receive refresher training at least every three years."  ECF No. 227-19 at 4.  Officer Kenison underwent training related to the use of force, the Americans with Disabilities Act ("ADA"), and mental illness and suicide detention and prevention.  *See* ECF No. 212 (Def. Cty. CSF) ¶¶ 1–6, 8. He was not trained on the use of leg sweeps, and the County does not condone the use of leg sweeps.  *See* ECF No. 212 ¶¶ 6–7.  The County does not have a specific policy for dealing with individuals with autism; however, Officer Kenison testified that autism was a subcategory of mental illness.  *See* ECF No. 229-1 at 5.

**B.    Procedural History**

Plaintiffs initially filed suit in September 2018, *see* ECF No. 1, and filed their First Amended Complaint a year later, *see* ECF No. 104.  The operative pleading, a Second Amended Complaint ("SAC"), was filed in January 2020.  *See* ECF No. 183.  The SAC is brought against Officer Kenison in his individual and official capacities, Chief of Police Paul Ferreira in his individual and official capacities, and the County of Hawaiʻi.  *See id.*  The SAC brings the following federal and state claims:  First Claim (against Officer Kenison)—§ 1983 use of excessive force; Second Claim (against the County and Chief Ferreira)—§ 1983

5

deliberately indifferent policies, practices, customs, training and supervision; Third Claim (against Officer Kenison)—§ 1983 false arrest; Fourth Claim (against Officer Kenison)—ADA wrongful arrest; Fifth Claim (against the County)—ADA failure to accommodate; Sixth Claim (against Chief Ferreira)—§ 1983 ratification of unconstitutional conduct; Seventh Claim (against the County and Chief Ferreira)—negligent hiring; Eighth Claim (against the County and Chief Ferreira)—negligent retention; Ninth Claim (against the County and Chief Ferreira)—inadequate training; Tenth Claim (against all Defendants)—U.S. Constitutional violations;[4] Eleventh Claim (against Officer Kenison)—assault and battery; Twelfth Claim (against Officer Kenison)—intentional infliction of emotional distress; Thirteenth Claim (against all Defendants)—loss of consortium; and Fourteenth Claim (against all Defendants)—punitive damages.  The parties stipulated to dismissal of the Seventh (negligent hiring) and Eighth (negligent retention) Claims and to dismissal of Chief Ferreira in his individual capacity.  *See* ECF No. 222.

---

[4]  Plaintiffs' general claim for constitutional violations references the First, Fourth, and Fourteenth Amendments.  *See* ECF No. 183 ¶ 131.  Defendants note that the Fourth Amendment applies to Plaintiffs' excessive force and false arrest claims, that the Fourteenth Amendment is inapplicable, and that Plaintiffs have not articulated facts implicating the First Amendment.  *See* ECF No. 218-8 at 10 n.1. Plaintiffs have not argued to the contrary, and so the Court addresses Plaintiffs' specific claims under the Fourth Amendment standard.  Moreover, at the hearing, Plaintiffs conceded the Tenth Claim is duplicative of their specific § 1983 claims, and may therefore be dismissed.

Defendants initially filed four separate motions for partial summary judgment.  *See* ECF Nos. 207, 208, 209, 211.  The Court struck three of those motions as an improper attempt to circumvent page limitations.  *See* ECF No. 216. The Court allowed Defendants to proceed with the motion for summary judgment filed on behalf of the County on Plaintiffs' § 1983 claims for excessive force (First Claim); false arrest (Third Claim); deliberately indifferent policies, practices, customs, training, and supervision (Second Claim); ratification (Sixth Claim); and inadequate training (Ninth Claim).  *See* ECF Nos. 211, 212.  Plaintiffs oppose that motion.  *See* ECF No. 228, 229.

Defendants then re-filed another motion for partial summary judgment.  *See* ECF No. 218.  That motion, filed on behalf of all Defendants, seeks summary judgment on Plaintiffs' claims for excessive force (First Claim), false arrest (Third Claim), wrongful arrest under the ADA (Fourth Claim), failure to accommodate under the ADA (Fifth Claim), assault and battery (Eleventh Claim), intentional infliction of emotional distress (Twelfth Claim), loss of consortium (Thirteenth Claim), and punitive damages (Fourteenth Claim).  *See id.*  In support of this motion, Defendants rely on their previously filed concise statement of facts and supporting exhibits.  *See* ECF No. 212.  Plaintiffs also oppose this motion.  *See* ECF No. 226, 227.

The Court held a telephonic hearing on Defendants' motions for partial summary judgment on June 19, 2020.  *See* ECF No. 236.

## II.    LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "This burden is not a light one."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  When the moving party bears the burden of proof at trial, he must come forward with evidence that would entitle him to a directed verdict if the evidence went uncontroverted at trial, and must establish the absence of a genuine issue of fact on each issue material to his case.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  In contrast, when the non-moving party bears the burden of proof, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party.  *See id.*  But the moving party need not disprove the opposing party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  *See id.* at 323–24; Fed. R. Civ. P. 56(c)(1).

8

"[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992) (citation omitted).  Rather, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (internal quotation marks and ellipsis omitted).

### III.   DISCUSSION

### A.   False Arrest (Third Claim)

Defendants seek summary judgment in their favor on Plaintiffs' claim alleging false arrest.  The Court first assesses whether Plaintiffs raise a triable issue regarding whether such a violation occurred and, even so, if Officer Kenison is nonetheless entitled to qualified immunity.

### 1.   Whether There Was a Fourth Amendment Violation

An arrest made without probable cause or other justification can form the basis of a § 1983 claim as a violation of the Fourth Amendment.  *See Dubner v. City & County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).  A seizure of an individual based on mental illness is analogous to a criminal arrest, and so must be supported by probable cause.  *See Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991), *as amended on denial of reh'g* (Apr. 1, 1992).  Plaintiffs bear the burden of proof on the issue of an unlawful arrest, but can make a prima facie case by

9

showing the arrest was a warrantless one. *See Dubner*, 266 F.3d at 965.  Because

there was no arrest warrant here, the burden shifts to Defendants to prove Officer

Kenison had probable cause for a warrantless arrest; although the burden of proof

remains with Plaintiffs, the burden of production thus shifts to Defendants.  *See id.*

"Probable cause exists when, under the totality of the circumstances known to the

arresting officers (or within the knowledge of the other officers at the scene), a

prudent person would believe the suspect had committed a crime." *Id.* at 966

(citation omitted).[5]  Here, Charles was seized not for a crime, but due to his mental

health status under Hawaiʻi Revised Statutes ("HRS") § 334-59, which provides:

> If a law enforcement officer has reason to believe that a person
> is imminently dangerous to self or others, the officer shall call
> for assistance from the mental health emergency workers
> designated by the director.  Upon determination by the mental
> health emergency workers that the person is imminently
> dangerous to self or others, the person shall be transported by
> ambulance or other suitable means, to a licensed psychiatric

---

[5]  Defendants appear to argue that Plaintiffs waived this claim because, at her
deposition, Rosalinda agreed it would be *appropriate* for Officer Kenison to *stop*
Charles.  *See* ECF No. 210-10 at 21.  The Court disagrees.  A layperson's
acknowledgment that an officer may stop an individual is not necessarily a
concession that seizing and arresting that person was legally permissible based on
probable cause.  *See Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir.
2016) (noting investigatory stop requires lower threshold of evidence and need not
be supported by probable cause like arrest or seizure).  Rosalinda's statement that
stopping Charles would have been appropriate is therefore not a concession Officer
Kenison had probable cause to arrest Charles.  The same is true of her testimony
that she did not have an issue with Charles going to the hospital, *see* ECF No. 210-
10 at 21, which is not necessarily a concession that Officer Kenison had probable
cause to arrest Charles in order to facilitate that transport.

> facility for further evaluation and possible emergency hospitalization[.]

HRS § 334-59(a)(1).  "Imminently dangerous to self or others" is defined to mean that "without intervention, the person will likely become dangerous to self or dangerous to others within the next forty-five days."  HRS § 334-1.

Thus, for purposes of this case, probable cause exists if Officer Kenison had facts and circumstances within his knowledge sufficient to warrant a reasonable belief that Charles was imminently dangerous to himself or others, as those terms are further defined under Hawaiʻi law.  *See Arekat v. Donohue*, 404 F. App'x 160, 161 (9th Cir. 2010) (addressing arrest under prior version of HRS § 334-59(a)(1)). Defendants rely on general evidence related to Charles' autism, such as his historic difficulty in crossing streets alone, what had occurred in Charles' life in the days leading up to this incident, as well as events that occurred *after* Officer Kenison seized him, such as Charles' conduct in the ambulance and at the ER.  *See* ECF No. 210 ¶¶ 1–9, 15–16, 39–40.  But the Court must focus on what facts and circumstances Officer Kenison knew at the moment he seized Charles.  *See Edgerly v. City & County of San Francisco*, 599 F.3d 946, 953 (9th Cir. 2010); *see also Arekat*, 404 F. App'x at 162 ("[Plaintiff's] demeanor and statements made *after* he was seized by defendants cannot provide the probable cause that defendants were required to have *before* they seized him.").

Here, viewing the evidence in the light most favorable to Plaintiffs, Officer Kenison did not have access to 911 calls made to Dispatch and was only aware of the information relayed directly to him from Dispatch. *See* ECF No. 227-6 at 14; ECF No. 234 at 10. Specifically, when approaching Charles a little over 20 minutes after the call from Dispatch, Officer Kenison knew the call involved a behavioral disorder, that Charles was a 25-year-old autistic male who had an anxiety attack and had not slept for two weeks, and was now running away from his residence around Ainaoloa Drive and Alaloa Road, and running through a neighbor's property. *See* ECF No. 210 ¶¶ 21–22; ECF No. 210-16 at 1–2; *see also* ECF No. 210-20 at 5.

As noted above, what transpired after Officer Kenison arrived on the scene is largely in dispute. According to Officer Kenison, he observed Charles walking and trotting away from Rosalinda with no obvious sense of direction, and believed Charles suffered from some kind of mental illness. *See* ECF No. 210 ¶¶ 24–25. Officer Kenison attempted to verbally communicate with Charles through his open passenger-side window at the intersection of Hoʻokano and Koʻele Streets, but Charles did not respond. *See id.* ¶¶ 26–27. He then saw Charles dart westbound across Koʻele Street and continue along Hoʻokano Street towards Kuleana Loop. *See id.* ¶ 28. Charles was unresponsive to Rosalinda's pleas that he stop and come back to her. *See id.* ¶ 29. Officer Kenison pursued Charles on foot, commanding

him to stop, and advising him that he was under arrest. *See id.* ¶ 30.  When Officer

Kenison caught up to Charles on the sidewalk in front of a residence at 197

Hoʻokano Street, Charles turned south and attempted to cross Hoʻokano Street.

*See id.* ¶ 31.  Officer Kenison then grabbed Charles' right shoulder and left arm to

keep him stationary so that he could handcuff him; however, Charles resisted and

tried to break free, while shouting delusional religious statements. *See id.* ¶¶ 32–

33.  Officer Kenison then readjusted his grip, and used an arm bar takedown to

restrain Charles prone on the sidewalk and handcuffed him. *See id.* ¶ 34–35.

According to Plaintiffs, Charles was only walking—not trotting. *See*

Inocencio Decl. ¶ 5b; Larkin Decl. ¶¶ 4, 7b.[6]  Neither Rosalinda nor Tristan heard

Officer Kenison say anything to Charles through his window because it was

closed. *See* ECF No. 227-4 ¶ 5b; ECF No. 227-3 ¶ 7b.  By the time Officer

Kenison approached, Charles had been positioned safely at the northeast corner of

the intersection of Hoʻokano and Koʻele Streets for about thirty seconds. *See* ECF

---

[6]  Defendants object that, during the 911 call, Rosalinda said Charles was "running
away" from their home. *See* ECF No. 234 at 14 n.7.  But at her deposition, she
confirmed Charles only ran after Officer Kenison arrived on the scene. *See* ECF
No. 227-10 at 9–10.  Regardless of whether this raises issues regarding Rosalinda's
credibility, the Court may not weigh such issues on summary judgment—
particularly where Defendants have not argued, for example, that the Court should
disregard Rosalinda's declaration as a sham.

No. 227-3 ¶ 7b; ECF No. 227-4 ¶¶ 5b, 5d.[7]  Tristan and Rosalinda were also

stopped near the northeast corner of that intersection and saw Officer Kenison turn

left onto Koʻele from Hoʻokano and park on the right side of Koʻele, facing

towards the dead end.   *See* ECF No. 227-4 ¶ 5b; ECF No. 227-3 ¶ 7b.[8]  After

Officer Kenison parked and exited his vehicle, he approached Charles from behind,

getting within three feet of Charles—who was still standing on the northeast corner

of the sidewalk—and, according to Tristan, said loudly "Hey Charles, Hey

Charles," which startled Charles.  *See* ECF No. 227-4 ¶¶ 5b, 5e.  According to

Tristan, Charles looked, saw Officer Kenison, turned, and ran around past Officer

Kenison westbound across Koʻele Street.  *See id.* ¶ 5b.  When he reached the

middle of Koʻele Street, Officer Kenison yelled at Charles:  "Stop running, freeze,

put your hands in the air!"  *Id.* (some capitalization omitted).  According to

Rosalinda, Officer Kenison yelled, "Stop running! Freeze! Put your hands in the

air!" and Charles then started running.  ECF No. 227-3 ¶¶ 7b, 7d.[9]  Both Tristan

---

[7]  According to Tristan's deposition testimony, Charles was stopped and dancing on the corner before Officer Kenison arrived.  *See* ECF No. 210-6 at 16.

[8]  Pictures submitted by Plaintiffs show that the end of that block of Koʻele was a dead end.  *See* ECF No. 227-3 ¶ 11; ECF No. 227-13.

[9]  According to Rosalinda's deposition testimony, Charles was dancing at the time Officer Kenison told him:  "Freeze.  Put your hands in the air.  You're under arrest."  *See* ECF No. 210-10 at 23.  And Charles ran only after Officer Kenison began to run first.  *See id.*

and Rosalinda dispute that Charles' crossing of Koʻele Street could be described as "darting," *see* ECF No. 227-4 ¶ 5e; ECF No. 227-3 ¶ 7e, with Tristan noting that Charles proceeded straight across Koʻele Street to the northwest corner of the sidewalk, *see* ECF No. 227-4 ¶ 5e.

Rosalinda denies that she ever said anything to Charles or asked him to stop running or come back in Officer Kenison's presence, and Tristan confirms he never heard Rosalinda say as much.  *See* ECF No. 227-3 ¶¶ 7c, 7f; ECF No. 227-4 ¶ 5c.  Neither Rosalinda nor Tristan heard Charles make any of the religious statements that Officer Kenison claimed he heard.  *See* ECF No. 227-4 ¶¶ 5g, 5h; ECF No. 227-3 ¶¶ 7g, 7h, 7i.  According to both Tristan and Rosalinda, Officer Kenison followed Charles on the sidewalk of Hoʻokano and within seven to ten seconds caught up with Charles, stopped him by placing him in a bear hug, and almost immediately used his right leg to sweep Charles' feet out from under him, causing Charles to forcefully hit the concrete with his head.  *See* ECF No. 227-4 ¶ 5h; ECF No. 227-3 ¶ 7h.  Thus, contrary to Officer Kenison's accounts, there was no struggle or a need to make a second attempt to restrain Charles because "Charles was bear-hugged and immediately taken down with force."  ECF No. 227-4 ¶ 5i; ECF No. 227-3 ¶ 7i.[10]  While another HCPD officer, Officer

---

[10]  In his deposition, Tristan repeatedly described the leg sweep as happening

(continued . . .)

Kanakaʻole-Ioane, claimed she saw a struggle and needed to assist Officer Kenison in handcuffing Charles, there is evidence that Officer Kanakaʻole-Ioane was not present on the scene until after Officer Kenison took Charles to the ground and that Officer Kenison handcuffed Charles on his own, without assistance.  *See* ECF No. 227-4 ¶¶ 6a, 6b; ECF No. 227-3 ¶¶ 6'a, 6'b; *see also* ECF No. 227-5 (Taiʻi Decl.) ¶ 3.

Although Officer Kenison said he could not recall if there was traffic on the roadway Charles was running on, *see* ECF No. 210-20 at 20, it is undisputed that block of Koʻele was a dead-end street, that the neighborhood was quiet with not much car traffic during the time of day that these events occurred, and that those following Charles encountered only one other car on the road during this entire period.  *See* ECF No. 227-9 at 14, 23; ECF No. 227-11 at 6; ECF No. 227-17 at 3–4; *see also* ECF No. 230 (videos submitted by Plaintiffs demonstrating level of traffic on Charles' route on April 2, 2018).[11]

---

(. . . continued)
nearly simultaneously after the bear hug—although testifying that Charles was clearly stopped before the leg sweep.  *See* ECF No. 227-9 at 21, 26, 30. Rosalinda's deposition testimony is in accord.  *See* ECF No. 227-10 at 12.

[11]  Plaintiffs submitted another picture to show that Kaulike Street, which Charles also traveled down, is also a dead-end street.  *See* ECF No. 227-3 ¶ 11; ECF No. 227-14; *see also* ECF No. 218-18 (Defendants' exhibit depicting Charles' route).

Defendants contend Officer Kenison had probable cause to seize Charles under HRS § 334-59(a)(1) because he was imminently dangerous to himself and others based on:  the information he received from Dispatch, Charles' resistance to his caregivers' pleas and Officer Kenison's personal observation of his defiance of his caregivers' demands, his refusal to obey police orders, his pedestrian recklessness, and his active resistance to seizure.  *See* ECF No. 218-1 at 20.  Under the relevant Hawaiʻi law, "dangerous to self" means the person recently has "threatened or attempted suicide or serious bodily harm"; or the person recently has behaved in such a manner as to indicate that the person is "unable, without supervision and the assistance of others, to satisfy the need for nourishment, essential medical care, shelter or self-protection, so that it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded."  HRS § 334-1.  Viewed in Plaintiffs' favor, Officer Kenison knew Charles was autistic, had an anxiety attack, had not slept, was running through neighbor's property, and had now been traveling a little over 20 minutes.  Officer Kenison only observed Charles running across a quiet, dead-end road upon seeing the officer and before he was told to stop and put his hands in the air.  Viewed in the light most favorable to Plaintiffs, then, a reasonable jury could conclude that Officer Kenison did not have probable cause to believe Charles was imminently dangerous to himself—particularly because it was not

17

*probable* that Charles would die or suffer substantial bodily injury or serious debilitation if not immediately seized by Officer Kenison and involuntarily hospitalized.

That leaves whether Charles was imminently dangerous to others, where "dangerous to others" means "likely to do substantial physical or emotional injury on another, as evidenced by a recent act, attempt or threat."  HRS § 334-1.  Officer Kenison explained that he believed Charles posed a danger to others because, if someone was driving down the road and Charles ran in front of that car, the driver would be forced to slam the brakes and could potentially become injured.  *See* ECF No. 210-20 at 20.  And on the form that he submitted to the hospital, Officer Kenison offered a similar justification, noting that Charles "[b]egan running from residence on Alaloa Rd to Hookano Rd through traffic creating a danger to himself & others after not responsive to requests & commands."  *See* ECF No. 227-28 (some capitalization omitted).  But according to Plaintiffs' version of events, there was no traffic to run through, and the only command disobeyed was given after he became startled by Officer Kenison and had already begun to run across the street.  Viewed in the light most favorable to Plaintiffs, then, a reasonable jury could conclude that Officer Kenison did not have probable cause to believe that Charles posed an imminent threat to others, warranting the equivalent of an arrest.

18

As a result, it cannot be established as a matter of law whether or not probable cause existed to justify Charles' seizure, and Defendants' motion for summary judgment on this ground must be DENIED.  *See Green v. City & County of San Francisco*, 751 F.3d 1039, 1046 (9th Cir. 2014) (noting that the reasonableness of an officer's conduct should be decided by a jury where the inquiry turns on disputed issues of material fact).[12]

### 2.   Qualified Immunity

Defendants contend that, even if they are not entitled to judgment as a matter of law that there was no Fourth Amendment violation, Officer Kenison is nonetheless entitled to qualified immunity on this claim.  Qualified immunity protects government employees performing discretionary functions from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  "Because the standard for probable cause is well settled, the question with respect to whether an unlawful

---

[12]  While Defendants submit a declaration from Dr. Robert C. Marvit, his opinion that Charles needed to be immediately detained is based in large part on disputed facts—such as what Charles and others said and did.  *See* ECF No. 210-2 (Marvit Decl.) ¶¶ 5–9.  Thus, reliance on this evidence is insufficient to warrant judgment in Defendants' favor—particularly when it offers facts and opinions without proving that Officer Kenison had knowledge of the same, and diagnoses Charles with certain conditions that are inconsistent with Charles' ER records.  *Compare id.*, *with* ECF Nos. 227-26, 227-27.

arrest violated clearly established law is 'whether it is *reasonably arguable* that there was probable cause for arrest[.]'" *Sialoi*, 823 F.3d at 1233 (quoting *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011))  "[T]hat is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Id.* (citation omitted).

Even taking all facts in the light most favorable to Plaintiffs, the Court concludes Officer Kenison is entitled to qualified immunity because it is reasonably arguable that he had probable cause to seize Charles under HRS § 334-59(a)(1).  Considering the information Officer Kenison received from Dispatch and his own observations on the scene, reasonable officers could disagree whether Charles, without intervention, was likely to become dangerous to himself within the next 45 days because his current mental state—particularly his lack of sleep for two weeks and his anxiety attack—would render him unable, without supervision, to satisfy the need for self-protection such that it was probable that serious physical debilitation would result.  *See* HRS § 334-1; *see also Maag*, 960 F.2d at 774–76 (granting officers qualified immunity after they arrested plaintiff pursuant to Montana law applicable in emergencies given plaintiff was weak, irrational, and lacked coordination; plaintiff's family informed officers of behavior they were concerned with; and officers observed plaintiff acting disoriented).

Defendants' motion on this basis is therefore GRANTED.

**B.      Excessive Force (First Claim)**

Defendants also seek summary judgment on Plaintiffs' claim that Officer

Kenison used excessive force in violation of the Fourth Amendment.  Again, the

Court first examines whether a violation occurred and, if so, whether Officer

Kenison is nonetheless entitled to qualified immunity.

### 1.      Whether There Was a Fourth Amendment Violation

As discussed above, the parties' versions of events differ in many material

ways.  Relevant to Plaintiffs' excessive force claim, the Court must accept—for

purposes of this motion—that when approaching Charles, Officer Kenison made

no attempt to communicate with him through his window and instead, either (a)

startled him from behind and then yelled for him to stop and freeze after Charles

began running across the street, or (b) yelled for Charles to stop and freeze even

though Charles was not running, which startled Charles and caused him to run.

Under either scenario, Officer Kenison caught up with him at most ten seconds

later, placed him in a bear hug by wrapping his arms around him at which time

"Charles appeared completely stopped and under control," and then performed the

leg sweep, forcing Charles to hit the concrete hard with his head.  *See, e.g.*, ECF

No. 227-4 ¶¶ 5–6 ("I observed Officer Kenison to have total control over Charles

when he had Charles in a bear hug."); *see also* ECF No. 227-3 ¶¶ 7, 6' (claiming

bear hug "stopped Charles in his tracks" and that Officer Kenison "had Charles

under total control" so that "[h]e wasn't going anywhere"); *see also* ECF No. 227-11 at 3 (testimony of owner of residence that Officer Kenison stopped Charles in front of noting: "I think I saw him grasp the young fellow.  I mean, he was in complete control of him.  And then I heard the sound [of Charles' head hitting the concrete].").  Less than a minute elapsed from the time Officer Kenison spotted Charles until Charles was in custody.  *See* ECF No. 210-16 at 3–4.

At the time of the incident, Charles was 5'10" and weighed around 114 pounds; Officer Kenison was 6'1" and weighed 395 pounds.  *See* ECF No. 227-4 ¶ 5h; ECF No. 227-3 ¶ 7h; ECF No. 227-15; *see also* ECF No. 227-11 at 3 (testimony of residence owner indicating Charles seemed "frail" and appeared to be in his "early teens, maybe 12, 13 years old, perhaps" and that Officer Kenison appeared to be "well over 200, maybe 300, pounds").  Defendants concede Officer Kenison was not trained on the use of leg sweeps, and that HCPD does not condone the use of leg sweeps.  *See* ECF No. 212 ¶¶ 6–7; ECF No. 211-1 at 6–7, 11, 17; *see also* ECF No. 210-3 (Kenison Decl.) ¶ 8; ECF No. 227-25.  And according to Plaintiffs, after Charles was handcuffed, Officer Kenison did not perform a pat-down search.  *See* ECF No. 227-4 ¶ 5j; ECF No. 227-3 ¶ 7j.

The parties dispute the extent of Charles' injuries.  Again, taking the evidence in Plaintiffs' favor, Charles' head broke his fall on the concrete, causing him to bleed profusely from his left forehead, cheek, and lip, and leaving a 5-inch

by 5-inch pool of blood on the sidewalk.  *See* ECF No. 227-4 ¶ 5h; ECF No. 227-3 Decl. ¶ 7h.  Rosalinda administered first aid to Charles; neither officer did.  *See* ECF No. 227-3 ¶ 7k.  Defendants describe Charles' injuries as minimal.  *See* ECF No. 218-1 at 26 (citing expert report of Dr. Robert C. Marvit, ECF No. 198, opining that Charles' resumption of normal behavior a week after the incident was an indication of the lack of long-term effects and that the "tiny subdural and resolved hemorrhage are of no clinical significance").  Plaintiffs, however, submit evidence indicating that Charles was diagnosed with a traumatic subarachnoid hemorrhage, which is a type of stroke caused by bleeding in the space around the brain that can be life-threatening.  *See* ECF No. 226 at 20 (citing ECF No. 227-26 at 14).  Although the hemorrhage resolved within a few days, it was later discovered that Charles had a subdural hematoma.  *See id.* (citing ECF No. 227-27).  Records from Charles' ER visit state as follows:  "Critical care time for this patient was 45 minutes[.]  The treatment of this patient required direct personal management and the withdrawal of, or failure to initiate these interventions on an urgent basis could have resulted in a significant threat to health or life."  *See* ECF No. 227-26 at 14.  Viewed in Plaintiffs' favor, this refers to Charles' head injury rather than his mental health status.  Thus, a reasonable jury could conclude that Charles' head injury was not insignificant and potentially severe, although has not resulted in symptoms that affect his daily life.

To determine whether Officer Kenison's use of force was objectively reasonable in light of these facts and circumstances, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted).  The Ninth Circuit has repeatedly indicated that, because the excessive force inquiry nearly always requires a jury to sift through disputed facts and draw inferences, summary judgment in these types of cases should be granted sparingly.  *See Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011).  This case is no exception; because there remain questions of fact regarding the reasonableness of Officer Kenison's actions, summary judgment is not warranted.

### a.     Type and Amount of Force

Under the first step, looking at the type and amount of force inflicted, the parties again have conflicting views.  Taking the evidence in the light most favorable to Plaintiffs, Officer Kenison seized Charles in a bear hug—which stopped Charles and placed him under Officer Kenison's control—and then performed a leg sweep that caused Charles to hit his head on the concrete and

suffer bleeding and an eventual subdural hematoma, although not causing any long-term effects on his daily life.[13]

The Ninth Circuit has, in an unpublished decision, described the use of a leg sweep as "relatively mild force" in the context of apprehending an individual engaged in excessive resistance where there was no indication the plaintiff sustained a head injury.  *See Garcia v. City of Santa Clara*, 772 F. App'x 470, 472 (9th Cir. 2019) (noting officer used reasonable force to pull plaintiff into the hallway and then conducted a leg sweep, control holds, and punched plaintiff in the face in response to plaintiff's undisputed efforts to resist arrest by punching and kicking officers).

More relevant here, other courts have recognized that "executing a forceful leg sweep maneuver that would put someone on the ground (potentially head first) could, especially without any prior training, foreseeably lead to very severe injuries."  *Patel v. City of Madison*, No. 5:15-CV-0253-VEH, 2018 WL 1881326, at *21 (N.D. Ala. Apr. 19, 2018), *aff'd*, 959 F.3d 1330 (11th Cir. 2020).  In *Patel*,

---

[13]  Given the Court must accept Plaintiffs' version of events, Defendants' multitude of citations to cases involving an arm-bar takedown are not persuasive here.  Nor are the other cases Defendants cite wherein an officer brings an arrestee to the ground in a more controlled, less sudden and potentially injurious manner.  *See Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1093, 1096–97 (9th Cir. 2006) (bar arm control hold); *Jackson v. City of Bremerton*, 268 F.3d 646, 650, 652–53 (9th Cir. 2001) (plaintiff went to knees and leaned down and officer pushed her the rest of the way).

for example, the Eleventh Circuit noted that a jury could conclude that a leg sweep that caused permanent partial paralysis "was both gratuitous and excessive" where the plaintiff was subjected to an investigatory stop and not resisting, but the officer nonetheless "applied great force in a manner that all but ensured that [plaintiff's] head would break both of their falls, since [the officer] was holding [plaintiff's] hands behind his back at the time."  959 F.3d at 1339.  In doing so, the Eleventh Circuit rejected the argument that leg sweeps are performed regularly and *in some cases* might constitute *de minimis* force because it did not account for: (a) the officer's lack of training in the maneuver or (b) the manner in which the officer executed that leg sweep.  *Id.* at 1342.  Instead, the Eleventh Circuit observed the risk of the maneuver as follows:

> [W]e have said that the "human skull is a relatively hearty vessel for the brain, but it will generally not fare well in a contest with hardened" ground, and when an officer uses "extreme force" to bring the skull into contact with the ground, he can expect that a multitude of injuries will reverberate from that collision.

*Id.* at 1342 n.5 (quoting *Saunders v. Duke*, 766 F.3d 1262, 1269 (11th Cir. 2014)).

And in a case where the plaintiff suffered injuries more minor than Charles', the Ninth Circuit affirmed a verdict concluding an officer had engaged in excessive force when he executed a leg sweep causing the plaintiff to fall face first onto the pavement—even though that plaintiff received only "a minor abrasion on his face" and had resisted, obstructed, and delayed the officer—because the plaintiff did not

say anything threatening to the officer, meaning any perceived threat "was not 'immediate' or significant enough to justify a leg sweep maneuver."  *See Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1113–14, 1116 (9th Cir. 2017).  So, too, here, a jury could credit Tristan, Rosalinda, and the residence owner's testimony regarding the speed with which the leg sweep occurred at a time when Charles was incapable of resisting and so posed no threat to Officer Kenison, himself, or others. *See, e.g.*, ECF No. 227-4 ¶ 4 (describing Charles being "*slammed*" to the ground (emphasis added)); ECF No. 227-11 at 3, 7 (residence owner testifying he saw Officer Kenison grasp Charles and was "in complete control of him" and then heard "the sound," and seeing blood reinforced his thought on how Charles fell and "how he was *thrust* onto the concrete ground" which caused "[a] real katonk sound . . . [a] loud sound" that suggested Charles fell on his head rather than his face (emphasis added)).[14]  And, as in *Patel*, the jury could also conclude the force was significant given the leg sweep occurred while Officer Kenison had Charles' arms restrained in a way that made it likely Charles' head would break his fall—and thus reject Defendants' contention that the leg sweep here consisted of *de minimis* force in the form of an empty-hand control technique.

---

[14]  At his deposition, the residence owner read entries from his calendar and journal from the day of the incident, wherein he recorded that Charles was "struck down by obese cop" and "caught & slammed onto concrete floor (sidewalk)."  ECF No. 227-11 at 2.

### b.    Government's Interest in Force

Under the second step, the strength of the government's interest is measured by reference to three factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (internal quotation marks and citation omitted).  This list is "non-exhaustive"; "[c]ourts still must 'examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).  Particularly relevant here, some such factors include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn*, 673 F.3d at 872 (noting the "most important" factor is whether the individual posed an immediate threat to the safety of officers or others (citations omitted)).  The mere desire to resolve a situation quickly does not, standing alone, justify using force that may cause serious injury.  *See id.* at 876–77.

28

First, the severity of the crime favors Plaintiffs because Defendants do not contend Charles committed any crime.  Next, Defendants argue Charles posed a threat to himself, Officer Kenison, and others because the altercation occurred near a road.  But viewing the evidence in Plaintiffs' favor, the road was not busy with traffic and was in a quiet neighborhood.  More importantly, although Officer Kenison claims Charles was turning to cross another street, viewed in Plaintiffs' favor, Officer Kenison caught up with Charles and immediately halted his progress and subdued him.  Thus, a jury could conclude Charles posed no threat to anyone when Officer Kenison executed the leg sweep.  Indeed, according to Plaintiffs' version of events, Officer Kenison did not conduct a pat down after handcuffing Charles, so a jury could conclude Officer Kenison had little concern Charles was armed and dangerous.

The extent to which Charles was actively resisting arrest or fleeing requires more discussion.  Viewed in the light most favorable to Plaintiffs, although Charles continued to run after Officer Kenison instructed him to stop and freeze, he was unable to resist or flee once Officer Kenison bear-hugged him.  Thus, this disobedience in resistance or flight was minor because it ceased by the time the leg sweep occurred.  *See Bryan*, 630 F.3d at 829–30 (arrestee's cursing and muttering to himself and exiting his vehicle despite being told to stay in car was not active resistance);  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055–56 (9th Cir. 2007)

29

(arrestee's actions in physically impeding the officer's search of his pockets was not active resistance); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (concluding refusal to remove hands from pockets and entry into home despite officers' orders and physical resistance "for only a brief time" were not "particularly bellicose" and therefore provided little support for use of significant force); *Glenn*, 673 F.3d at 875 (crux of resistance was refusing to follow commands rather than attacking or threatening officers or others, and so was "less than active resistance" in summary judgment context).  A reasonable jury could therefore conclude Charles' initial disobedience did not justify Officer Kenison's leg sweep—particularly given he initiated the leg sweep without warning or opportunity to cease noncompliance.  *See Nelson v. City of Davis*, 685 F.3d 867, 881–82 (9th Cir. 2012).

The Court may also consider whether there was less intrusive means of force that Officer Kenison could have used before resorting to an immediate leg sweep resulting in Charles' head breaking his fall on concrete.  Granted, Officer Kenison was not required to avail himself of the *least* intrusive means possible.  *See Glenn*, 673 F.3d at 876.  Still, police must consider what other tactics were available and if there were clear, reasonable, and less intrusive alternatives to the force used—for example that presented a lesser threat of serious injury—that counsels against finding the force reasonable.  *See id.*; *see also id.* at 878 (available lesser

alternatives are relevant to ascertaining the range of reasonable conduct and is one factor in the *Graham* calculus).  In addition, "[a]ppropriate warnings comport with actual police practice" and "such warnings should be given, when feasible, if the use of force may result in serious injury."  *Glenn*, 673 F.3d at 876 (citation omitted).  Here, a jury could conclude that Officer Kenison did not warn Charles before he executed a leg sweep that resulted in Charles' head injury, even though it would have been feasible for him to do so and also to attempt a more controlled maneuver to handcuff Charles or bring Charles down to the pavement.

That Officer Kenison knew Charles was autistic, anxious, and sleep-deprived must also be considered.  *See Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.").  The Ninth Circuit has recognized that, when dealing with an emotionally disturbed individual who is creating a disturbance or even resisting arrest—as opposed to a dangerous individual suspected of a crime—officers typically use less force because increasing the force can exacerbate the situation (unlike with a criminal suspect, where increased force can bring a dangerous situation to a swift end).  *See Deorle*, 272 F.3d at 1281–83; *cf. Glenn*, 673 F.3d at 876 (noting that, even if an emotionally disturbed individual acts out and invites

31

the use of deadly force, the government interest in such force is diminished by fact that officers are confronted with a mentally ill individual and not a person who has committed a serious crime). A trier of fact could find Officer Kenison's knowledge about and observations of Charles necessitated the use of different tactics to calm or restrain Charles than those that were used. For example, Plaintiffs' expert opines that Officer Kenison unnecessarily escalated the situation and, given Charles' mental health status, should have used different methods like slowing things down and gathering information from others rather than shouting or running, and using force as a last resort. *See* ECF No. 227-30 at 6, 9; *see also Glenn*, 673 F.3d at 877 (noting rational jury may rely on expert evidence in assessing whether officer's use of force was unreasonable).[15]

### c.    Balancing Nature of Force against Government's Interest

Overall, if a jury credits Plaintiffs' version of events, it could find that Officer Kenison subjected Charles to severe force even though he did not resist once Officer Kenison stopped him and he no longer posed any threat. Were the jury to make such findings, it could conclude the amount of force employed significantly exceeded the amount of force necessary to restrain Charles, who

---

[15] While Defendants' expert comes to the opposite conclusion—that only a takedown would have worked to restrain Charles at the roadside—again, that opinion is based on Defendants' version of events and, in any event, such disputes among experts are for the fact-finder to resolve. *See* ECF No. 210-2 ¶ 9.

needed assistance based on mental health issues.  *Compare Shafer*, 868 F.3d at

1113–14, 1116, *and Fischer v. Hoven*, 925 F.3d 986, 989 (8th Cir. 2019)

(collecting cases where tackling nonviolent misdemeanant or using leg sweep on

nonviolent misdemeanant was unreasonable where individual was not threatening

anyone, actively resisting arrest, or attempting to flee), *with Estate of Tapueluelu v.*

*City & County of San Francisco*, 268 F. App'x 639, 640 (9th Cir. 2008)

(affirming[16] summary judgment in favor of officers who conducted rear leg sweep

after large, strong, intoxicated, and suicidal individual was found standing on the

ledge of a fifth-floor apartment, was handcuffed, but then began to struggle with

officers where there was no evidence officer threw plaintiff to the ground violently

or *face first*); *Bibbins v. Des Moines Police Dep't*, No. C13-139RAJ, 2014 WL

908884, at *4–5 (W.D. Wash. Mar. 7, 2014) (concluding leg sweep reasonable

where plaintiff was occupying stolen vehicle and not following officer's

commands to get on ground); *Gunter v. Township of Lumberton*, 535 F. App'x

144, 146 (3d Cir. 2013) (concluding leg sweep reasonable where undisputed

evidence indicated intoxicated plaintiff made wild arm motions, spoke angrily, and

refused to comply with officers' efforts to place him in handcuffs), *and Huntley v.*

*City of Owasso*, 497 F. App'x 826, 828–29, 832 (10th Cir. 2012) (concluding leg

---

[16] The district court decision provides the necessary context.  *See Estate of*
*Tapueluelu v. City & County of San Francisco*, No. C 04-01612 CRB, 2006 WL
581094, at *3–4 (N.D. Cal. Mar. 7, 2006).

sweep on violent plaintiff was objectively reasonable when it was undisputed plaintiff was struggling with officers even after they performed an arm bar, officer performed leg sweep in way he had been trained to do including by holding plaintiff's arms as he fell, and take down occurred once officers had pulled plaintiff to the yard).

"Underlying *Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest must be balanced against the need for force:  it is the *need* for force which is at the heart of the *Graham* factors."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (internal quotation marks and citations omitted).  Here, balancing the relevant interests at stake, a reasonable jury could conclude there was no need for the force Officer Kenison used to take down and handcuff Charles.  For this reason, Defendants' motion for summary judgment on this basis is DENIED.

### 2.    Qualified Immunity

To determine whether Officer Kenison is nonetheless entitled to qualified immunity, the Court must consider whether, even assuming he violated Charles' constitutional rights, that constitutional right was clearly established at the time of the alleged violation.  *See Saucier v. Katz*, 533 U.S. 194, 201 (1994), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009).  The "clearly established law should not be defined at a high level of generality"; rather, it "must

34

be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks and citations omitted). To determine whether the law is clearly established for qualified immunity purposes, a court looks to binding precedent or, in the absence of that, to decisions of state courts, other circuits, and district courts—as even unpublished decisions of district courts may inform the analysis. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003).

Defendants point to numerous cases to argue that Officer Kenison would not have been on notice that the use of force employed here was unconstitutional; however, the factual circumstances surrounding the arrests in those cases were vastly different from the facts here. As discussed above, in *Tapueluelu*, a leg sweep was permissible when performed on a large, strong, suicidal man who was actively struggling with police and was not brought down violently or face first. *See* 268 F. App'x at 640; *see also Huntley*, 497 F. App'x at 832; *Woodard v. Tabanara*, 125 Hawai'i 247, 257 P.3d 1224 (table), No. 30096, 2011 WL 2611288, at *2 (App. June 30, 2011) (SDO) (leg sweep permissible as to one suspect who retreated, which distracted officer from other two suspects, and threw away what appeared to be contraband).[17]

---

[17] Relevant here, *Woodard* actually noted that "courts have ruled that a police

(continued . . .)

In *Shafer*, the Ninth Circuit concluded that an officer had not violated clearly

established law when he progressively increased the use of force from verbal

commands, to an arm grab, and then to a leg sweep when a misdemeanant refused

to comply with orders and resisted, obstructed, or delayed the officer in a

"challenging environment."  *See* 868 F.3d at 1117.  But here, according to

Plaintiffs' version of events, Charles at most continued running after he was

ordered to stop and freeze and, once grabbed and stopped, no longer resisted,

obstructed, or delayed Officer Kenison.  Nor was this the challenging environment

presented in *Shafer*—where hundreds to thousands of intoxicated college students

---

(. . . continued)

officer does not use excessive force in employing a leg sweep *unless the suspect
poses no threat to the police officer*."  2011 WL 2611288, at *2 (emphasis added)
(collecting cases).  Here, according to Plaintiffs' version of events, Charles posed
no threat at the time Officer Kenison executed the leg sweep.  *Woodard* thus
*supports* that Officer Kenison violated a clearly established right according to
Plaintiffs' accounts.  The other cases Defendants cite are similarly unhelpful
because they reflect the rule in *Woodard* that leg sweeps are permissible when the
suspect poses a threat to the officer.  *See Vester v. Hallock*, 864 F.3d 884, 887, 888
(8th Cir. 2017) (plaintiff threatened to stab various individuals, refused to comply
with officer's repeated commands, there was a real possibility a knife was
concealed on his person, and officer performing arm bar was making arrest alone);
*Fox v. DeSoto*, 489 F.3d 227, 235–37 (6th Cir. 2007) (plaintiff was believed to be
armed, had been removed from a flight for creating a disturbance, was
uncooperative and refused to identify himself, and pulled away from officer and
reached for his side prompting arm-bar takedown); *cf. City & County of San
Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. at 1765, 1771 (plaintiff was
approaching officers with a knife, undeterred by pepper spray, prompting officers'
shots).

were congregated.  *See id.* at 1113.  Indeed, while the Ninth Circuit in *Shafer*

rejected the plaintiff's argument that the officer had violated rights established in

cases that involved comparable degrees of force, it did so because those cases did

not involve a challenging environment or an act of physical resistance or

obstruction by the arrestee.[18]  *See id.* at 1117–18 (citing, e.g., *Meredith v. Erath*,

342 F.3d 1057, 1061 (9th Cir. 2003) (holding it was clearly established by 1998

that grabbing plaintiff by arms, forcibly throwing her to the ground, and twisting

her arms while handcuffing her was excessive where she was suspected of a

nonviolent crime, only passively resisted the handcuffing, did not pose a safety

risk, and did not attempt to leave)); *see also Winterrowd v. Nelson*, 480 F.3d 1181,

1186 (9th Cir. 2007) (holding it was clearly established, at least by 1998, that no

reasonable officer would believe he could force a harmless motorist against the

hood of a car and cause him unnecessary pain by twisting his arm where motorist

claimed he was unable to comply with instructions to put his arm behind his back).

 *Shafer* is further distinguishable because the officer there did not perform an

untrained maneuver on someone suffering from a mental illness.  Here, it is

relevant that Officer Kenison was untrained in this maneuver, which was itself

contrary to County policy, *see* ECF No. 212 ¶¶ 6–7, and that another County

---

[18]  The jury in *Shafer* had explicitly found the officer had probable cause to arrest
the plaintiff for resisting, obstructing, and delaying arrest.  *See* 868 F.3d at 1117.

policy on approaching individuals with mental illness provided that, if the use of force was required, "officers *shall* attempt to use the *least* amount of force necessary to bring the situation under control and/or affect the arrest," ECF No. 227-19 at 2–3 (emphases added).  Thus, these policies "are relevant not only to whether the force employed in this case was objectively unreasonable," *see supra* section III.B.1, "but also to whether reasonable officers would have been on *notice* that the force employed was objectively unreasonable."  *Drummond*, 343 F.3d at 1062; *see also Sheehan*, 135 S. Ct. at 1777–78 (noting only that officer acting contrary to his training "does not itself negate qualified immunity where it would otherwise be warranted," although not indicating such facts are wholly irrelevant).[19]

And, as discussed above, the Eleventh Circuit in *Patel* denied qualified immunity where someone suspected of criminal activity suffered a head injury as a result of a forceful leg sweep maneuver the officer had not been trained to execute. *See* 959 F.3d 1330.  While *Patel*—and the district court decision it affirmed—were decided after the incident here, they nonetheless recognized that, at least since 2000, that Circuit has repeatedly ruled that a police officer violates the Fourth

---

[19]  While policies are only relevant so long as their purpose is to protect the individual against whom force is used, *see Scott v. Henrich*, 39 F.3d 912, 915–16 (9th Cir. 1994), Defendants do not claim Charles is not an intended beneficiary of such policies.

Amendment and should be denied qualified immunity "if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Id.* at 1343 (citation omitted).  In *addition*, the Eleventh Circuit concluded the "obvious clarity" test applied in that case, i.e., that a certain type of force is so obviously a violation of the Fourth Amendment that a plaintiff need not point to particularized preexisting case law.  *See id.  Patel* noted that, crediting the plaintiff's version of events, "no reasonable officer could have thought that sweeping [plaintiff's] legs out from under him and throwing him to the ground headfirst was a reasonable use of force" when the plaintiff was "somewhat frail and was not resisting or attempting to flee" meaning "the law clearly forbade [the officer's] forceful takedown under the circumstances." *See id.* at 1343–44.

Outside the context of leg sweeps specifically, courts in the Ninth Circuit have similarly recognized that "it is fair to say that a law enforcement officer may not employ severe force when the suspect does not pose a significant danger to him and he could have used less abusive means to restrain the suspect." *Petrolino v. County of Spokane*, 678 F. Supp. 2d 1082, 1088 (E.D. Wash. 2009) (citations omitted); *see id.* at 1089 (noting that *Deorle*, regarding use of bean bag bullets on emotionally disturbed man who was not threatening or resisting, and *Drummond*, regarding applying force to mentally ill arrestee's chest while handcuffing him,

39

placed officers on notice that they could not use knee strikes to control a detainee who was neither threatening them, actively resisting them, or intentionally disobeying their commands).

For example, as early as 2000 the Ninth Circuit cited, in a case addressing pepper spray, a different case involving the use of police dogs, and noted:

> The same principle is applicable to the use of pepper spray as a weapon: the use of such weapons (e.g., pepper sprays; police dogs) may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force.

*LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000). The same may be said of the leg sweep here, if Plaintiffs' version of events is credited: no reasonable officer would believe that he or she could proceed with a forceful leg sweep likely to result in Charles' head breaking his fall where Charles was already rendered helpless and subdued by Officer Kenison's bear hug. *See also Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("Because the officers had control over the protesters[,] it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control[.]").

That no Ninth Circuit case addresses the use of leg sweeps in an analogous case does not mean Defendants win as a matter of law; officers are not entitled to

qualified immunity on the grounds that the law is not clearly established "every time a novel method is used to inflict injury." *Deorle*, 272 F.3d at 1285–86 (citation omitted). In *Deorle*, for example, the Ninth Circuit concluded that every officer should know it is unreasonable to shoot a lead shot in a cloth case at an unarmed man who has not committed a serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such significant force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals. *See id.* This was so even though there was no prior case prohibiting that specific use of force in those precise circumstances. *See id.* Indeed, citing *Deorle*, another district court in this Circuit stated that "[i]t was clearly established by 2014 that application of intermediate, significant force to apprehend a mentally ill individual not suspected of any serious crime is excessive where the force was applied at a time when the suspect was offering no resistance and was facing away from the officer." *See Harper v. County of Merced*, No. 1:18-cv-00562-LJO-SKO, 2018 WL 5880786, at *14 (E.D. Cal. Nov. 8, 2018) (noting it was clearly unlawful for officer to knee-kick plaintiff in chest while he was on the ground and "no longer running," also citing *Bryan*, 630 F.3d at 832, which held that it was clearly established by 2010 that significant use of force to arrest non-resisting individual without any warning was excessive).

In light of the above, the Court concludes that resolution of the genuine issues of fact regarding whether Charles' Fourth Amendment rights were violated is critical to a proper determination of whether Officer Kenison is entitled to qualified immunity. *See Glenn*, 673 F.3d at 870. Until the jury has made those decisions, the Court "cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful." *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (citation omitted). Therefore, Officer Kenison is not entitled to qualified immunity under Plaintiffs' version of events, and Defendants' motion for judgment on this basis is DENIED.

## C.   Section 1983 Claims against the County (First, Second, Third, Sixth, and Ninth Claims)

The County argues that it cannot be liable for any § 1983 violation because there was no underlying constitutional violation. However, as discussed above, a reasonable jury could conclude Charles' constitutional rights were violated; thus, the County is not entitled to summary judgment on this basis. Summary judgment in favor of the County is, however, warranted on other grounds.

"[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019)

42

(citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693–95 (1978)).  "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality."  *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  A plaintiff must also "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link" between the municipal policy or custom and the deprivation of federal rights.  *Id.*

To support their claims against the County, Plaintiffs rely primarily on the fact that HCPD does not have a policy for interacting with autistic people, and that its failure to train officers on interacting with autistic people caused Charles' rights to be violated.  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Still, culpability is "at its most tenuous" when based on a failure to train, and to succeed on this theory Plaintiffs must therefore demonstrate that a failure to train amounts to deliberate indifference to constitutional rights, *see id.*, i.e., that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Rodriguez v. County of Los Angeles*, 891 F.3d

43

776, 802 (9th Cir. 2018) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

A plaintiff may prove this type of *Monell* liability through evidence of a "failure to investigate and discipline employees in the face of widespread constitutional violations." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011); *see also Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (citation omitted)). Here, though, Plaintiffs do not point to a pattern of constitutional violations arising out of officers' interactions with autistic individuals. Instead, they rely only on Officer Kenison's interaction with Charles. And while "single-incident" liability may be possible, it nonetheless applies only in a narrow range of circumstances where there is an obvious need for a specific type of training. *See Connick*, 563 U.S. at 63–64 (offering example where officers are provided firearms but no training regarding how to use them to capture fleeing felons).

Here, Plaintiffs have failed to demonstrate this case falls into that narrow range of circumstances where liability may be premised on a single incident. Most importantly, Plaintiffs' proposed training mirrors HCPD's existing procedures for interacting with persons suspected of suffering from mental illness more generally. For example, Plaintiffs argue that, had Officer Kenison received training on

44

autistic individuals, he would have known:  not to yell at Charles; to practice de-escalation and slow things down by moving slowly rather than acting hastily; and to solicit help from friends and relatives.  *See* ECF No. 228 at 29.  Plaintiffs' proposed training mirrors Procedure Manual Section 6.1, which has been in effect since 2012:

> When interacting with an individual suspected of suffering from mental illness, personnel should:
> - Approach the person in a calm, non-threatening manner;
> - Be helpful and professional;
> - Remain calm and avoid overreacting;
> - Indicate a willingness to understand;
> - Speak simply and briefly, move slowly if possible;
> - Be friendly, patient, accepting, and encouraging, but remain firm;
> - Recognize that the person may be overwhelmed by sensations, thoughts, frightening beliefs, sounds (voices), or the environment;
> - Remove distractions, upsetting influences, and disruptive people from the scene;
> - Be aware that the uniform, gun, handcuffs, and baton may frighten a person with mental illness.  Reassure the person that no harm is intended; and
> - Recognize and acknowledge that a person's delusionary or hallucinatory experience is real to him or her.

ECF No. 227-19 at 3 (emphases omitted).[20]  Plaintiffs therefore have not raised a triable issue regarding an obvious need for more or different training

---

[20] This Procedure Manual also addresses assisting the individual *and family members* with referral to a medical facility or the process of voluntary or involuntary referral.  *See id.* at 2.  And Officer Kenison testified that autism was included as a subcategory of mental illness in training.  *See* ECF No. 229-1 at 5.

on autistic individuals specifically, and have similarly failed to raise a triable issue regarding whether this lack of a specific policy or alleged training deficiency was the "moving force" behind and actually caused the alleged constitutional violations here. *See Connick*, 563 U.S. at 59 n.5 (citations omitted). That Officer Kenison did not follow HCPD's procedure regarding interacting with individuals suffering from a mental illness is not sufficient to subject the County to liability. *See Hunter*, 652 F.3d at 1232 ("[A] municipality may not be held liable for the unconstitutional acts of its employees solely on a respondeat superior theory." (citation omitted)).

It is true—and troubling—that Officer Kenison's training on mental illness lapsed for some months, during which time the incident with Charles occurred. *See* ECF No. 212-3 at 3, 8 (indicating Officer Kenison's prior mental illness training expired in February 2018, but that his most recent training was not completed until August 2018); *see also* ECF No. 227-19 at 4 ("In addition to entry level mental illness training, all personnel shall receive refresher training at least every three years."). And Officer Kenison's deposition testimony suggests he had little recollection of HCPD procedures for interacting with an individual suspected of suffering from mental illness. *See, e.g.*, ECF No. 229-1 at 4–6, 23. But the fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to

fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390–91 (citations omitted); *see also Blankenhorn*, 485 F.3d at 484 ("[E]vidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy."). While Officer Kenison was not in compliance with HCPD policy requiring officers to complete a refresher training on mental illness every three years, there is no evidence that the County had notice of compliance problems with this training requirement and, again, there is no evidence of widespread violations of the rights of those with mental illness generally or autism specifically. *See Blankenhorn*, 485 F.3d at 484–85 (noting that absent evidence of a program-wide inadequacy in training, any shortfall in an individual officer's training amounts only to negligence rather than deliberate indifference, and affirming judgment in favor of municipality where plaintiff limited proof of failure to train to one specific officer); *see also Booke v. County of Fresno*, 98 F. Supp. 3d 1103, 1126–28 (E.D. Cal. 2015) (granting summary judgment for municipality because, although two officers failed to complete quarterly training required to carry and use a rifle under a specific policy, this constituted an isolated incident of that policy not being enforced and there were no other instances of personnel misusing rifles or engaging in

excessive force, such that plaintiff had failed to raise a triable issue

regarding inadequate training or deliberate indifference).

Plaintiffs also mention that the Chief did not conduct an Administrative

Review pursuant to the Policy 804 (regarding use of force) to determine if force

was justified or pursuant to Policy 604 (regarding critical incidents, which applies

when an incident results in death or serious bodily injury).  To the extent Plaintiffs

argue this means an official with final policy-making authority ratified a

subordinate's unconstitutional decision or action and the basis for it, they fail to

raise a triable issue.  *See Rodriguez*, 891 F.3d at 802–03.  First, Plaintiffs fail to

point the Court to any evidence to support the contention that no Administrative

Review occurred.  *See* ECF No. 228 at 7, 28 (citing no evidence to support

contention); *see also* ECF No. 229 (making no mention of this fact within

Plaintiffs' concise statement of facts).  In addition, whether a particular official has

final policy-making authority is a question of state law.  *See Pembaur v. City of

Cincinnati*, 475 U.S. 469, 483 (1986).  Here, Plaintiffs have not identified any state

law showing the Chief possesses final policymaking authority.  Moreover, "the

mere failure to investigate the basis of a subordinate's discretionary decisions" is

not a ratification of those decisions.  *See City of St. Louis v. Praprotnik*, 485 U.S.

112, 130 (1988).  And a policymaker's mere "acquiescence" in a single instance of

alleged unconstitutional conduct does not constitute "ratification" for purposes of

municipal liability.  *See Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds*, 135 S. Ct. 1765; *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992); *see also Praprotnik*, 485 U.S. at 130 (observing that "[s]imply going along with discretionary decisions" is not enough).

Plaintiffs have failed to raise a triable issue regarding the County's liability under § 1983, and the County's motion for summary judgment on Counts 2, 6, and 9 is therefore GRANTED.

## D.     Claims against Individual Defendants in Their Official Capacities

The County also asks the Court to dismiss the official capacity claims against Chief Ferreira and Officer Kenison because they are duplicative of Plaintiffs' claims against the County.  *See* ECF No. 211 at 2.  Generally, plaintiffs may seek prospective declaratory and injunctive relief against state officers, sued in their official capacities, to enjoin ongoing violations of federal law.  *See Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th Cir. 2000). However, "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive or declaratory relief."  *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (citation omitted).  Courts in this District have therefore dismissed official capacity claims as duplicative of claims brought

49

against a municipality.  *See, e.g.*, *Cramer v. City & County of Honolulu*, No. CIV 09-00223 SOM/KSC, 2010 WL 2541804, at *7 (D. Haw. June 23, 2010); *Dusenberry v. County of Kauai*, Civil No. 07-00180 JMS/LEK, 2007 WL 3022243, at *2 (D. Haw. Oct. 12, 2007).  Plaintiffs do not respond to the County's argument that their official capacity claims here are duplicative.  Moreover, in their pleading, Plaintiffs appear to seek declaratory and injunctive relief only against the County and Chief Ferreira for ongoing deliberate indifference in policies, practices, training, and supervision.  *See* ECF No. 183 ¶ 76.  The Court has already concluded Plaintiffs may not proceed on this theory of liability.  Because of this, and because Plaintiffs do not object to Defendants' request to dismiss all claims against individuals in their official capacities (and conceded as much at the hearing), the Court GRANTS judgment in Defendants' favor as to any such official capacity claims.

**E.     ADA Claims (Fourth and Fifth Claims)**

Plaintiffs also bring claims under the ADA for wrongful arrest (Fourth Claim) and for failure to accommodate (Fifth Claim).  Defendants argue, and Plaintiffs do not object, that ADA claims may only be brought against a public entity, such as the County, rather than against an individual police officer.  *See* ECF No. 218-1 at 34 (citing *Sheehan*, 135 S. Ct. at 1773 ("Only public entities are subject to Title II[.]" (citation omitted)));  *see also* ECF No. 226 at 42–43.   The

parties also appear to agree that an entity like the County can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees, such as Officer Kenison.  And the Ninth Circuit recognizes that Title II applies to arrests.  *See Sheehan*, 743 F.3d at 1232.  The Court will therefore presume these claims, which may only be brought against the County, may nonetheless be premised on Officer Kenison's conduct in arresting Charles.

The Ninth Circuit recognizes at least two types of Title II claims applicable to arrests:

> (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

*Id.* (citations omitted).  Plaintiffs bring both types of claims here.

### 1.    Wrongful Arrest

The parties agree that to state an ADA claim based on wrongful arrest, Plaintiffs must prove:  (1) Charles was disabled; (2) Officer Kenison knew or should have known he was disabled; and (3) Officer Kenison arrested him because of legal conduct related to his disability.  *See Lawman v. City & County of San Francisco*, 159 F. Supp. 3d 1130, 1147 (N.D. Cal. 2016).  The parties only dispute

the third element.  However, it is undisputed that Rosalinda requested assistance

because Charles was autistic, had not slept, had an anxiety attack, and was running

from their residence.  There is no evidence Officer Kenison sought to arrest and

detain Charles for any reason other than his mental health status.  Thus, as a matter

of law, the reason to arrest Charles was not discriminatory because it was not based

on misperceived criminal activity.  Plaintiffs argue that, because Officer Kenison

lacked probable cause to arrest Charles under § 334-59 or did not fully comply

with the procedures set forth in that provision, the arrest was discriminatory.

However, they cite no authority that an arrest based on a law permitting detention

for emergency mental health concerns is discriminatory if that detention is

ultimately found not to be supported by probable cause because it does not meet

the standard for immediacy the law requires.  The Court therefore GRANTS

judgment in Defendants' favor on Plaintiffs' ADA claim based on wrongful arrest.

### 2.    Reasonable Accommodation

Plaintiffs also assert Officer Kenison failed to reasonably accommodate

Charles' autism by approaching, communicating with, pursuing, and using force

against him without taking his autism into account and without employing tactics

that would have been likely to resolve the situation without injuring him.

Reasonable accommodation claims arise in the arrest context where police

"fail to reasonably accommodate the person's disability in the course of

investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan*, 743 F.3d at 1232 (citations omitted). To state this type of claim under the ADA, Plaintiffs must show: (1) Charles is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities; (3) he was excluded from participation or denied the benefits of these services, programs, or activities; and (4) that exclusion, denial of benefits, or discrimination was because of his disability. *See id.* at 1232. Plaintiffs bear the initial burden of producing evidence of an available reasonable accommodation, which the entity may then defeat by showing that the modification proposed would fundamentally alter the nature of the service, program, or activity. *See id.* at 1233.

Here, it is undisputed that Charles had a disability and that Officer Kenison knew about it at the time he encountered him. Thus, the crucial issue is whether the County failed to provide a reasonable accommodation when Officer Kenison shouted at Charles, pursued him, bear-hugged him, and executed a leg sweep without taking his mental illness into account. Plaintiffs assert Officer Kenison should have approached Charles more slowly and calmly, not shouted at Charles and instead engaged in non-threatening communications, elicited the help of Charles' family and friends on the scene, taken custody of Charles using a less extreme manner of force including by asking Charles to sit down, or waited for

other officers to assist.  *See* ECF No. 183 ¶ 100.  Interpreting the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Officer Kenison could have employed less rushed and confrontational tactics, including some of the accommodations Plaintiffs have listed.  Particularly relevant is the fact that much of Plaintiffs' requested accommodations are in line with HCPD's stated procedures for interacting with persons suspected of suffering from mental illness, including the manner of approaching and speaking with such individuals and using the least amount of force necessary to bring the situation under control.  *See* ECF No. 227-19 at 3.  In light of this evidence, a reasonable jury could reject Defendants' argument that Plaintiffs' requested accommodations would have been futile, where Charles was a distressed, sleep-deprived, and anxiety-ridden individual walking through a quiet neighborhood with virtually no traffic who did not respond well to the officer's startling approach.

These facts distinguish this case from *Moore v. City of Berkeley*, No. 14-cv-00669-CRB, 2018 WL 1456628 (N.D. Cal. Mar. 23, 2018), *aff'd*, 801 F. App'x 480 (9th Cir. 2020), on which Defendants rely—wherein the district court credited the *officers'* version of events because the plaintiff did not file an opposition.  *See id.* at *7, 12–14 (granting judgment for defendant where officer did attempt to diffuse situation for 15 to 20 minutes before using force to detain plaintiff, which plaintiff resisted for a significant period of time and, unlike in *Sheehan* where the

Ninth Circuit concluded summary judgment was inappropriate, there was nothing

suggesting the officers were the primary cause of the plaintiff's agitation and that

removing themselves would likely help calm her).  Nor is the Court persuaded by

the other cases Defendants cite.  Those cases primarily involved individuals who

had committed crimes and posed a more certain threat to the officers or the public.

*See* ECF No. 218-1 at 40.[21]  While the Ninth Circuit recognizes that "exigent

circumstances inform the reasonableness analysis under the ADA," *see Sheehan*,

743 F.3d at 1232 (citation omitted), given the posture here where the Court must

accept Plaintiffs' version of the facts, such exigent circumstances of impending

---

[21]  In *Roell v. Hamilton County*, 870 F.3d 471, 489 (6th Cir. 2017), officers
responded to an unsecured scene to find an individual who committed a series of
property crimes swiftly approaching them brandishing a hose with a metal nozzle.
In *Waller v. City of Danville*, 556 F.3d 171, 173, 176–77 (4th Cir.
2009), police faced an individual holding his girlfriend hostage who made threats
against the police indicating he had a weapon and, when police breached the house
after attempting to diffuse the situation after two hours, he rushed them with a
knife.  And in *Hainze v. Richards*, 207 F.3d 795, 801–02 (5th Cir. 2000), the
individual requesting the accommodation had already assaulted an officer with a
deadly weapon.  Nor is this case like *Harper v. County of Merced*, No. 1:18-cv-
00562 LJO SKO, 2020 WL 243118, at *9 (E.D. Cal. Jan. 16, 2020), where the
plaintiff's proposed accommodation was bringing a trained therapist to a scene
where the officer had already been struggling with plaintiff who had fled from a
hospital where he was receiving psychiatric treatment and swung a stick at hospital
staff.  And although *Bates by Johns v. Chesterfield County*, 216 F.3d 367, 372 (4th
Cir. 2000), also involved an autistic plaintiff, he had also assaulted a police officer
and continued to present an immediate threat to officers as evidenced by the fact
that he scratched and bit one and incapacitated another with a kick to the groin.

harm to Charles, Officer Kenison, or the nearby public are less compelling than in the cases Defendants rely on.

For these reasons, and because the reasonableness of an accommodation is ordinarily a question of fact, *see EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010), judgment in Defendants' favor on this basis is not warranted.

## F.     Claims under State Law and for Punitive Damages (Eleventh, Twelfth, Thirteenth, and Fourteenth Claims)

Plaintiffs have also brought various claims under state law and for punitive damages.  Defendants moved for judgment in their favor on these claims, arguing they are entitled to qualified privilege because Plaintiffs have not raised a triable issue regarding whether Officer Kenison was stirred by malice, that Plaintiffs may not bring an independent claim for punitive damages, and that the County cannot be liable for punitive damages.  *See* ECF No. 218-1 at 46–47.  Plaintiffs did not respond to these arguments indicating that they lack merit or point to any facts that would raise a triable issue and prevent the Court from granting judgment in Defendants' favor.  *See Abogados v. AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000) (holding that failure to raise argument in opposition to summary judgment constitutes waiver of that argument); *see also Yonemoto v. McDonald*, Civil No. 11-00533 JMS/RLP, 2015 WL 1863033, at *7 (D. Haw. Apr. 22, 2015) (citing

cases).[22]  The Court therefore GRANTS Defendant's motion regarding the

Eleventh, Twelfth, Thirteenth, and Fourteenth Claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN

PART Defendants' motions for partial summary judgment.  The claims that remain

for trial include only the First Claim (Excessive Force) against Officer Kenison in

his individual capacity and Fifth Claim (Failure to Accommodate under the ADA)

against the County.  Judgment for Defendants is granted on all other claims.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, July 29, 2020.



Jill A. Otake
United States District Judge

Civil No. 18-00360 JAO-KJM, *Larkin, et al. v. Kenison, et al.*; ORDER GRANTING IN PART AND DENYING
IN PART DEDENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

---

[22]  At the hearing, Plaintiffs conceded they failed to respond to these claims, but
cited Federal Rule of Civil Procedure 56(e)(1).  Plaintiffs did not, however, explain
why their brief did not point the Court to a triable issue or respond to Defendants'
legal arguments—nor did they explain why they did not move separately in the
months since that brief was filed to seek this relief.  The Court therefore declines to
grant Plaintiffs a second opportunity to raise these issues.